**Ricardo LYONS, on his own behalf and on behalf of others similarly situated, Plaintiff,**

**v.**

**Caspar WEINBERGER, Secretary of Health, Education and Welfare, Defendant.**

**No. 74 Civ. 1258.**

United States District Court, S. D. New York.

April 11, 1974.

NLSP Center on Social Welfare Policy and Law, New York City, by Steven J. Cole, New York City, Lloyd E. Constantine, Long Island City, N. Y., Adele M. Blong, New York City, Henry A. Freedman, New York City, for plaintiff.

Paul J. Curran, U. S. Atty., New York City, by Joseph P. Marro, Asst. U. S. Atty., Frank L. Dell'Acqua, Chief of Litigation, U. S. Dept. of Health, Education and Welfare, Baltimore, Md., by James C. Pyles, Baltimore, Md., for defendant.

FINDINGS OF FACT and
CONCLUSIONS OF LAW

MOTLEY, District Judge.

This case involves primarily the question whether disabled, blind and el-

derly persons who were receiving cash benefits in December 1973 pursuant to the New York Combined Program for Aged, Blind and Disabled Persons (AABD)* and who were transferred as of January 1, 1974 to the federally administered Supplemental Security Income (S.S.I.) program,** are entitled to notice and a hearing before their cash benefits are reduced by federal agency officials. Prior to January 1, 1974, when the cash benefits were administered by state agency officials, these recipients were entitled to such notice and hearing pursuant to federal regulation. 45 CFR § 205.10. Defendant, the Secretary of Health, Education and Welfare, acknowledges that thousands of New York recipients of S.S.I. benefits have had their benefits reduced in advance of notice and a hearing.

Plaintiff, Ricardo Lyons, is a recipient of S.S.I. cash benefits. Prior to January 1, 1974, he received $147.34 per month in cash benefits in addition to his social security check. In January and February, 1974, after transfer to the federally administered S.S.I. program, he continued to receive the same benefits. On March 1, 1974, however, he received an S.S.I. benefit check for only $96.35. The reduction was made without notice to plaintiff and without opportunity to be heard. He did receive a notice after receipt of the reduced check advising him of a right to reconsideration. The notice advised plaintiff that the reduction was based on the fact that the New York City Welfare Department

had not paid him the correct amount in December, 1973 because it did not know how much money he was getting in Social Security benefits. This, according to the notice, caused plaintiff to receive excessive S.S.I. payments in January and February. Plaintiff filed this action on March 19, 1974. Thereafter, the Social Security Administration, having been contacted by plaintiff's counsel, agreed to restore plaintiff's benefits after determining that the information furnished it by New York on which the reduction was based was erroneous.

Plaintiff alleges that the court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1361; 5 U.S.C. § 701 et seq. He asserts that his cash benefits, as well as the cash benefits of other recipients of S.S. I., have been either reduced or terminated without prior notice and hearing in violation of various federal regulations and the Fifth Amendment to the Constitution.

Plaintiff brings this action for injunctive relief on behalf of himself and all others similarly situated. Rule 23(b)(2), Fed.R.Civ.P. The court finds that other members of the class have had their S.S.I. benefits reduced based on information furnished by New York; others have been reduced without prior notice or hearing on the ground that they had obtained corresponding increases in their Social Security checks.

The court, at the conclusion of a hearing on March 20, 1974, and for the reasons stated on the record, issued a temporary restraining order.[1]

---

* N. Y. Social Welfare Law § 320 et seq. (McKinney 1966.)

** Social Security Act, 42 U.S.C. § 1381 et seq.

1. The temporary restraining order provides as follows:

"IT IS FURTHER ORDERED that pending hearing and determination of plaintiff's motion for a preliminary injunction, or further order of this Court, defendant, his successors in office, agents and employees, are enjoined from failing to provide plaintiff and other persons similarly situated any monthly benefits to which he was previously determined to be entitled and in the amounts paid in January

and February 1974, when such benefits are normally due on April 1, 1974, and from failing to provide plaintiff within five (5) days and others similarly situated within ten days all amounts previously withheld from plaintiff and others similarly situated."

The order that defendant provide members of the class with all amounts previously withheld was not an award of "retroactive benefits", Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), since the only money withheld was the money due for March. Thus the court merely directed that defendant pay, during the month of March, money still due.

Plaintiff now moves for a preliminary injunction and for class action certification. Rule 23(c). The court grants both motions for the reasons which follow.

Prior to January 1, 1974, needy aged, blind and disabled individuals, including plaintiff, received public assistance benefits under the New York State program established pursuant to Subchapter XVI of the Social Security Act. 42 U.S.C. § 1381 et seq. The Social Security Act authorized a joint federal/state program under which the state received substantial federal aid in support of its assistance program.

In 1972, Congress enacted a Supplemental Security Income (S.S.I.) program to replace the federal/state assistance programs for the aged, blind and disabled effective January 1, 1974. The Act provides for a minimum level of cash income benefits, funded by the federal government, for eligible individuals. All but specifically exempted income is deducted from the S.S.I. benefit level. However, since the authorized S.S.I. benefit levels were lower than those in effect in several states, including New York, Congress authorized the states to supplement these benefits. 42 U.S.C. § 1382e. The states could elect to have these "optional" supplemental benefits paid directly by the federal government, 42 U.S.C. § 1382e, in which case the actual cost of these "optional" supplementary payments are charged to the states, but the administrative costs of making these payments are borne by the federal government. 42 U.S.C. § 1382e(d). The "optional" benefits made by New York and some other states were still not sufficient to render the benefits received by transferred state recipients such as plaintiff equal to the benefits received by them under the New York program prior to transfer. In order to remedy this problem Congress had to induce the states to make up the difference.

Congress therefore mandated that any state, such as New York, receiving federal medicaid payments under Title XIX of the Social Security Act must make additional supplementary payments to the aged, blind or disabled so as to bring their S.S.I. benefits and other income up to the level of their December, 1973 income.[2] These benefits are known as "mandatory" S.S.I. payments.

2. The Act provided as follows:

(3) (A) The supplementary payment referred to in paragraph (2) which shall be paid for any month to any individual who is entitled thereto under an agreement entered into pursuant to this subsection shall (except as provided in subparagraph (D) and (E) be an amount equal to (i) the amount by which such individual's "December 1973 income" (as determined under subparagraph (B) exceeds the amount of such individual's "title XVI benefit plus other income" (as determined under subparagraph (C) for such month, or (ii) if greater, such amount as the State may specify.

(B) For purposes of subparagraph (A), an individual's "December 1973 income" means an amount equal to the aggregate of—

(i) the amount of the aid or assistance (in the form of money payments) which such individual would have received (including any part of such amount which is attributable to meeting the needs of any person whose presence in such individual's home is essential to such individual's well-being) for the month of December 1973 under a plan (approved under title I, X, XIV, or XVI, of the Social Security Act) of the State entering into an agreement

under this subsection, if the terms and conditions of such plan (relating to eligibility for and amount of such aid or assistance payable thereunder) were, for the month of December 1973, the same as those in effect, under such plan, for the month of June 1973, and

(ii) the amount of the income of such individual (other than the aid or assistance described in clause (i) received by such individual in December 1973, minus any such income which did not result, but which if properly reported would have resulted in a reduction in the amount of such aid or assistance.

(C) For purposes of subparagraph (A), the amount of an individual's "title XVI benefit plus other income" for any month means an amount equal to the aggregate of—

(i) the amount (if any) of the supplemental security income benefit to which such individual is entitled for such month under title XVI of the Social Security Act, and

(ii) the amount of any income of such individual for such month (other than income in the form of a benefit described in clause (i)).

(D) If the amount determined under subparagraph (B) (i) includes, in the case of any

The Act further provides that the states might enter into an agreement with the Secretary of Health, Education and Welfare whereby the Secretary, on behalf of such State, would administer these required supplementary payments. New York has entered into such an agreement.

## JURISDICTION

The court determines that it has jurisdiction of this action pursuant to 28 U.S.C. §§ 1343, 1361; and 5 U.S.C. § 702.

1. 28 U.S.C. § 1343(3)

This section is the jurisdictional statute for the Civil Rights Act, 42 U.S.C. § 1983, and provides in part:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

\*  \*  \*  \*  \*  \*

(3) To redress the deprivation under color of State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States. . . . "

■ Since plaintiff has a substantial constitutional claim, the only question is whether defendant can be held to be acting "under color of State law." According to Kletschka v. Driver, 411 F.2d 436 (2d Cir. 1969), "[i]t was the evident

purpose of § 1983 to provide a remedy when federal rights have been violated through the use or misuse of a power derived from a State. [citation omitted]. When the violation is the joint product of the exercise of a State power and of a non-State power then the test under the Fourteenth Amendment and § 1983 is whether the state or its officials played a 'significant' role in the result." *Id.* at 448.

In the instant case New York State is significantly involved in the federal program:

1. Benefits paid by the Social Security Administration are funded in large part by the state. [3]

2. The level of payments is governed by the AABD benefits paid out by the state in December, 1973.

3. The state elected to have the supplementary S.S.I. benefits paid out by the Social Security Administration. The state might have chosen to continue to administer the distribution of those benefits required to bring the federal minimum payments up to the levels previously paid by the state.

4. Defendant concedes that many of the reductions and terminations have resulted from information provided by state agencies which is fed into the Social Security Administration's computers located in Baltimore, Maryland and automatically results in reduced S.S.I. checks. [4]

---

individual, an amount which was payable to such individual solely because of—

(i) a special need of such individual (including any special allowance for housing, or the rental value of housing furnished in kind to such individual in lieu of a rental allowance) which existed in December 1973, or

(ii) any special circumstance (such as the recognition of the needs of a person whose presence in such individual's home, in December 1973, was essential to such individual's well-being), and, if for any month after December 1973 there is a change with respect to such special need or circumstance which, if such change had existed in December 1973, the amount described in subparagraph (B)(i) with respect to such individual would have been reduced on account of such change, then, for such month and for each month

thereafter the amount of the supplementary payment payable under the agreement entered into under this subsection to such individual shall (unless the State, at its option, otherwise specifies) be reduced by an amount equal to the amount by which the amount (described in subparagraph (B)(i)) would have been so reduced.
Public Law 93–66, § 212 (July 9, 1973).

3. See pp. 253–254 *supra.*

4. Oral argument, April 1, 1974.
Some of the reductions in SSI checks have resulted from information supplied by the Social Security Administration that recipients have received larger Social Security payments, as a result of the 7% increases which became effective on April 1, 1974.

Therefore, the state plays a critical role in defendant's determination to reduce or terminate benefits in advance of a hearing.

5. Public assistance has long been a predominantly state and local responsibility.

■ ▪ Since the court has jurisdiction of plaintiff's constitutional claims, it also has ancillary jurisdiction of plaintiff's claims under the regulations. Almenares v. Wyman, 453 F.2d 1075 (2d Cir. 1971), cert. denied, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972).

2. 28 U.S.C. § 1361

The federal mandamus statute, enacted in 1962, provides as follows:

"The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

■ Mandamus has traditionally been viewed as appropriate "to compel officials to comply with the law when no judgment [or discretion] is involved in that compliance." Leonhard v. Mitchell, 473 F.2d 709, 713 (2d Cir.) cert. denied, 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed. 2d 1002 (1973); Note, Developments in the Law: Remedies Against the United States and its Officials, 70 Harv.LRev. 827, 849 (1957).

■ Thus, a writ of mandamus may issue, without regard to a jurisdictional amount, when a federal official fails to comply with a specific statutory or regulatory direction, Leonhard, supra, at 713, or with a constitutional mandate. E. g., Burnett v. Tolson, 474 F.2d 877 (4th Cir. 1973); Cortright v. Resor, 325 F. Supp. 797 (E.D.N.Y.) (Weinstein, J.), rev'd on other grounds, 447 F.2d 245 (2d Cir. 1971), cert. denied, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972).

■ While it is sometimes said that mandamus will lie only if there is a "clear right" in the plaintiff to the relief sought and a "clear duty" on the part of the defendant to do the act in question, e. g., Burnett, supra, at 880, "[a] judge must judge by his own lights, and if he does see the duty as 'clear,' that is decisive even though disagreement with him is reasonable." L. Jaffe, Judicial Control of Administrative Action, 184 (1965).[5]

■ For the reasons stated at pp. 258–262, infra, the court concludes that it is sufficiently clear that defendant had a duty to act in the manner requested by plaintiff, to permit mandamus.[6]

The court does not consider controlling Aguayo v. Richardson, 473 F.2d 1090, 1101 (2d Cir. 1973), in which the Second Circuit held that 28 U.S.C. § 1361 was not a basis for jurisdiction, since the legal questions at issue there were considerably more difficult than those presented here and, therefore, the duty to act here was "clearer," making it a more appropriate case for mandamus.

3. Administrative Procedure Act

The Administrative Procedure Act provides in relevant part:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

---

5. For an argument that the remedy "in the nature of mandamus" created by 28 U.S.C. § 1361 should not be governed by common law limitations on mandamus, see Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and 'Nonstatutory' Judicial Review of Federal Administrative Action, 81 Harv.L. Rev. 308 (1967).

6. Even though an argument might be made that pre-reduction hearings were not clearly required, Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), leaves no room for doubt that pre-termination notices and hearings are required. See pp. 260–261, infra. Since it is alleged that some members of the proposed class have had their benefits terminated in advance of notice and a hearing, (Affidavit in Support of Intervention of Frederick Taylor and Ann Taylor), these allegations would be sufficient to give the court pendent jurisdiction under the mandamus statute.

"The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter . . . or, in the absence or inadequacy thereof, any applicable form of legal action . . . in a court of competent jurisdiction." 5 U.S.C. § 703.

"Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

Whether the Administrative Procedure Act is an independent grant of federal jurisdiction has yet to be resolved by the Supreme Court or the Second Circuit. *E. g., Aguayo, supra,* 473 F.2d at 1101–1102; Mills v. Richardson, 464 F.2d 995, 1001 n. 9 (2d Cir. 1972).

However, a number of decisions involving the *standing* of litigants to raise claims under the A.P.A. strongly suggest that the A.P.A. was also intended to be an independent jurisdictional grant.

In Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the Supreme Court held that in order to have standing, a party need only allege " . . . that the challenged action has caused him injury in fact, economic or otherwise," provided that it appeared that the interest sought to be protected by the plaintiff was arguably within the zone of interests regulated by statute or the Constitution. The Court added that "[w]here statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action." *Id.* at 154.

In United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), a standing case, the Supreme Court noted that " '[t]he basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the

trifle is the basis for standing and the principle supplies the motivation.' "

Finally, as the Second Circuit stated in Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97 (2d Cir.), cert. denied, 400 U.S. 949, 91 S.Ct. 237, 27 L. Ed.2d 256 (1970), a case concerned primarily with the standing of environmental groups who lacked an economic stake in the controversy, "[t]here can be no question at this late date that Congress intended by the Administrative Procedure Act to assure comprehensive review of 'a broad spectrum of administrative actions,' including those made reviewable by specific statutes without adequate review provisions as well as those for which no review is available under any other statute." 425 F.2d at 102.

A holding that the A.P.A. was not an independent jurisdictional grant would effectively overrule those cases granting standing to parties lacking an economic interest if they were required to meet the jurisdictional amount requirement of 28 U.S.C. § 1331. [7]

Moreover, the legislative history of the A.P.A. demonstrates that Congress intended to afford a broad right of judicial review. The Senate Judiciary Committee report stated that the bill set forth " . . . a simplified statement of judicial review designed to afford a remedy for every legal wrong." Administrative Procedure Act, Legislative History, 79th Congress, 193 (1946).

The report of the House Judiciary Committee likewise declared that the bill " . . . confers a right of review upon any person adversely affected in fact by agency action or aggrieved within the meaning of the statute." *Id.* at 276.

Moreover, the Supreme Court has repeatedly held that the broadly remedial provisions of the A.P.A. are available to review administrative decisions in the absence of "clear and convincing evidence" that Congress intended to pre-

---

7. There would, of course, be no problem if there were other statutory bases for jurisdiction, such as 28 U.S.C. § 1361.

clude review. *E. g.,* Data Processing Service, supra, 397 U.S. at 156; Rusk v. Cort, 369 U.S. 367, 379–380, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962). [8]

Nor should 5 U.S.C. § 703, providing that, in the absence of adequate special statutory review, legal actions might be brought in any court of "competent jurisdiction" be read to require that the actions be brought in courts with independent federal jurisdiction. The Committee reports make it reasonably clear that Congress merely intended to leave existing venue requirements unaltered. *See* Legislative History, 276, 369.

■ Nevertheless, even though the A.P.A. is an independent grant of federal jurisdiction, plaintiff, in the absence of special statutory review, can appeal only from "final administrative action." The question is whether the administrative action of which members of the class complain, i. e., the reduction or termination of their S.S.I. payments, is not final until they have exhausted their administrative remedies by requesting a re-determination of the Secretary's action. [9]

However, "the administrative exhaustion doctrine is less an inflexible command than a general guideline [citation omitted]; where 'an immediate appeal is necessary to give realistic protection to the claimed right,' [citation omitted], a court may properly carve an exception to the rule." Bristol-Myers Co. v. F. T. C., 469 F.2d 1116, 1118 (2d Cir. 1972).

■ Review is available under the A. P.A. only if preliminary or procedural agency action threaten so irreparable an injury as to justify interlocutory resort to corrective judicial process. *Id.*

■ For the reasons stated at pp. 262–263, *infra,* the court finds that mem-

bers of the class would be irreparably harmed if they were required to exhaust their administrative remedies before they could obtain relief in this court.

4. 28 U.S.C. § 1331

In view of the court's finding that it has jurisdiction under 28 U.S.C. §§ 1343, 1361 and 5 U.S.C. § 702, it need not reach the question of whether 28 U.S.C. § 1331 affords jurisdiction in this case.

## MOOTNESS

The Secretary has suggested that plaintiff Lyons' claim is now moot since his payments have been restored. Defendant also undertakes that since he has now made an "initial eligibility determination" [10] as to Mr. Lyons, the plaintiff is no longer subject to reductions in advance of notice and hearing.

■ Assuming that Mr. Lyons' claim is now moot, however, the claim was not moot at the time he filed his complaint.[11] Moreover, fourteen members of the class seeking leave to intervene have filed affidavits [12] alleging that their payments have been reduced or terminated in advance of hearings. Whether or not their payments have been reduced or terminated, as alleged, they have standing since, in view of the position the Secretary has taken in this action,[13] their payments are subject to reduction without advance notice and hearing. Their claims are, therefore, not moot. *See, generally,* Washington v. Wyman, 54 F.R.D. 266 (S.D.N.Y.1971).

## PRELIMINARY INJUNCTION

■ Plaintiff requests that the court enjoin defendant from reducing, suspending or terminating monthly S.S. I. benefits to any person receiving mandatory minimum supplementary benefits

---

8. As Professor Jaffe has written:
 "It does seem inapt to make it a condition of a suit against an officer that the right asserted be given a value, if indeed in many cases it is even possible." *Jaffe, supra,* at 165. *See also* Byse & Fiocca, *supra,* at 330.

9. 20 C.F.R. § 416.1408 et seq.; 39 Fed.Reg. 1054 (Jan. 4, 1974).

10. See p. 259 *supra.*

11. See p. 252 *supra.*

12. The parties have agreed that the court dispense with the filing of complaints by the intervenors.

13. See pp. 258–259 *infra.*

until he has afforded such persons adequate advance notice of the intended action and an opportunity to contest such action at a hearing comporting with due process standards and the requirements of 20 C.F.R. §§ 416.1420, 416.1419(a), and 416.1417(c).

◼ The court first notes that a three-judge court is not required to hear plaintiff's motion for a preliminary injunction pursuant to 28 U.S.C. § 2282, since the administrative action complained of is not " . . . so plainly directed or permitted by the statute [42 U.S.C. § 1381 et seq.] that no fair construction could hold otherwise. . . ." Sardino v. Federal Reserve Bank, 361 F.2d 106 (2d Cir. 1966); *see also* Mills v. Richardson, 464 F.2d 995, 1001 (2d Cir. 1972) (dicta). Indeed, the court concludes at pp. 262–263, *infra*, that the Social Security Act requires such advance notice and opportunity to be heard as is requested in plaintiff's motion. Therefore, plaintiff's prayer for injunctive relief cannot be

construed as a constitutional attack on the federal statute.

◼ The two-fold requirement for a preliminary injunction is a demonstration of probability of success on the merits and a showing that irreparable harm will result if such relief is denied. Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc., 476 F.2d 687 (2d Cir. 1973). In the alternative, a preliminary injunction may issue if serious questions are raised and the balance of hardships tips sharply in plaintiff's favor. Charlie's Girls, Inc. v. Revlon, Inc., 483 F.2d 953 (2d Cir. 1973). Plaintiff has satisfied this burden.

1. *Probability of Success on the Merits.*

The Secretary has recently promulgated proposed regulations which are to be effective until final adoption of regulations [14] providing for notice and fair hearing procedures for certain categories of recipients prior to reductions or terminations of benefits.[15]

---

14. See 20 C.F.R. Part 416, 39 Fed.Reg. 1055 (Jan. 4, 1974); 20 C.F.R. Part 416, 39 Fed. Reg. 12027 (April 2, 1974).

15. The regulations provide in part:
Subpart N
20 C.F.R. § 416.1419
Reconsideration of initial determinations of continuing eligibility (post-eligibility claims).
(a) *Advance notice of adverse action required.* Subpart M of this part describes the conditions under which the Administration shall give notice to the parties of an adverse post-eligibility initial determination involving a reduction, suspension, or termination of benefits in advance of effectuation. Upon receipt of a timely filed request for reconsideration of such initial determination, the Administration shall continue benefits as specified in § 416.1420 and provide the parties thereto an opportunity for a formal conference (or at the option of the parties, an informal conference or a case review). The parties will be advised of their rights which may be exercised at the formal conference, informal conference, or upon case review as specified in § 416.1417 (a)(b) and (c). On the basis of such formal conference, informal conference, or case review, the Administration shall render a reconsidered determination as specified in § 416.1416.

(b) *Advance notice of adverse action not required.* The conditions under which the Administration may effectuate adverse post-eligibility initial determinations involving reductions, suspensions, or terminations of benefits without advance notice to the parties to such initial determinations are described in Subpart M of this part. Upon receipt of a timely filed request for reconsideration of such initial determination, the Administration shall provide the parties thereto an opportunity for a case review or an informal conference (see § 416.-1417(a) and (b)). On the basis of such case review or informal conference, the Administration shall render a reconsidered determination as specified in § 416.1416. 39 Fed.Reg. 1055 (Jan. 4, 1974).
Subpart M
Part 416.
This subpart also contains procedural provisions applicable to suspension or termination (in accordance with this subpart) or reduction (see Subpart D of this part) of benefits occurring after the establishment of initial eligibility and amount of payment. Determination of amount of payment in converting from the Federal-State public assistance programs to SSI is considered to be part of the initial process of establishing eligibility and amount of payment.

Defendant, however, contends that his regulations do not require a prior opportunity to be heard in cases where a determination is made that the recipient obtained payments from the state for which he was ineligible in December, 1973. Defendant relies on the following provisions of Subpart M:

"This subpart also contains procedural provisions applicable to suspension or termination or reduction of benefits occurring after the establishment of initial eligibility and amount of payment. Determination of amount of payment in converting from the Federal-State public assistance programs to SSI is considered to be part of the initial process of establishing eligibility and amount of payment." 39 Fed.Reg. 12028 (April 2, 1974).

Defendant argues that reductions made based on a determination that the recipient was receiving payments from the state for which he was ineligible are part of the "initial process of establishing eligibility and amount of payment." He asserts that, because S.S.I. payments for January, 1974 had to be geared to the state's payments for December, 1973, there was insufficient time to establish the proper amount of payment on a case-by-case basis when checks were sent out for January.

Plaintiff, on the other hand, argues that the initial determination of eligibil-

ity and amount occurred when the change-over from the federal/state to the S.S.I. program became effective. In this connection, plaintiff received a notice from HEW, dated December 31, 1973, stating that he was " . . . eligible . . . to receive the Supplemental Security Income payment . . . [of $147.30] . . . ." (Exhibit C, attached to Order to Show Cause for T.R.O., Preliminary Injunction and Class Certification).

Moreover, it should be noted that 20 C.F.R. § 416.1419(a) seems to require an opportunity to be heard in advance of "initial determinations" made after eligibility has been determined and the Secretary concedes that all recipients of state assistance in December, 1973 were determined to be "eligible" for benefits. (Oral argument, April 4, 1974).

While the Secretary's interpretation of his own regulations is entitled to great weight, it is possible that, after trial on the merits, the court will conclude that the regulations do require advance hearings in cases such as Mr. Lyons'.[16]

Nevertheless, assuming that the Secretary's interpretation of the regulations is correct, the regulations, as applied, are unconstitutional and in violation of the Social Security Act for the reasons set forth at pp. 260–262, *infra*.

With respect to reductions made in S. S.I. benefits on the basis of correspond-

---

§ 416.1336
Notice of proposed adverse action affecting recipient's payment status.
(a) Advance written notice of intent to discontinue payment because of an event requiring suspension, or to reduce (see Subpart D of this part), or terminate payments prior to effectuation of the action will be given in all cases except where:
(1) The Administration has factual information confirming the death of the recipient; or
(2) Amendments to Federal law or an increase in benefits payable under Federal law (other than benefits payable under this part) require automatic suspension, reduction, or termination of benefits under this part; or
(3) Clerical or mechanical error has been made in effectuation of a determination or decision; or

(4) (i) The facts indicating such suspension, reduction, or termination action were supplied by the recipient; and
(ii) The conclusions to be drawn from such facts are not subject to conflicting interpretations; and
(iii) The facts are complete. 39 Fed.Reg. 12028, 12030 (April 2, 1974).

16. Although the reductions complained of apparently occurred prior to March 25, 1974, the date Subpart M became effective, an injunction might issue on the basis of violations of the regulation, if violations of the regulation were found, since defendant has made it clear that, in view of his interpretation of the regulation, he intends to continue to make reductions without advance hearings and notice.

ing increases in Social Security payments, defendant relies on 20 C.F.R. § 416.1336 which provides that advance notice of a reduction is not required if it results from an increase in benefits payable under Federal law.

While the Secretary clearly seems to be in compliance with this provision, the regulation is of doubtful constitutionality.

Plaintiff claims that the Secretary's actions have violated the due process clause of the Fifth Amendment. In Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Supreme Court held that due process requires a state to afford an opportunity for an evidentiary hearing prior to *termination* of public assistance payments to a particular individual.

The issues presented by the reductions based on redeterminations of eligibility as of December, 1973 are whether recipients of S.S.I. benefits whose payments are reduced below December, 1973 standards, or terminated, are being deprived of a statutory entitlement and, if so, whether due process requires advance notice and an opportunity to be heard in advance of the reductions.

Defendant argues that due process requirements "do not apply to determinations of the level of initial entitlement in a social welfare program." Defendant claims in essence that when the S.S.I. program became effective federal officials might have chosen to determine in each case appropriate benefits for eligible recipients. Benefits received under the old state public assistance programs merely provided guidance as to the appropriate S.S.I. levels.

While the court assumes, without deciding, that due process standards do not apply to initial applications for public assistance, the Supplemental Security Income program merely provided a means of continuing state public assistance programs for the aged, blind and disabled under federal administration.

A state would not be permitted to evade the requirements of Goldberg v. Kelly simply by transferring its public assistance programs to a new agency and, then, labeling terminations of welfare payments determinations of initial entitlement.

There is, of course, no reason to suggest that Congress, in enacting the Supplemental Security Income amendments, intended such a result. Instead, Congress specifically geared the S.S.I. benefits to the assistance levels paid by the states in December, 1973. Thus, recipients' statutory entitlements under state law were maintained, subject, of course, to the proviso that benefits must be reduced to the extent that it was later determined that a recipient had been receiving payments in December, 1973 for which he was ineligible or that he was later receiving additional income from other sources.

Recipients of S.S.I. payments, therefore, have a statutory entitlement to the benefits they had been receiving in December, 1973 from the states. These payments, of course, might subsequently be determined to be too high by the Secretary under applicable statutory standards, just as, under state public assistance legislation, state and local welfare officials might determine that existing payments to particular individuals are excessive. In short, the court cannot see how transfer of aid programs to the federal government modified recipients' rights to their previously existing levels of benefits.

The next question is whether due process requires notice and a hearing before benefits can be terminated or reduced. There can, of course, be no doubt that *Goldberg* precludes terminations of benefits in advance of notice and an opportunity to be heard "where recipients have challenged proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of

particular cases." [17]  *Goldberg, supra,* 397 U.S. at 268.

In this case, reductions have been made on several grounds, all based on factual determinations.

Reductions have been based on information furnished by the state agency that, in December 1973, excessive payments had been made by the state 1) because shelter grant allowances had been disregarded; 2) the correct amount of Social Security benefits received by the beneficiary had not been considered; or 3) other members of the beneficiary's household were receiving grants under other welfare programs.

*Goldberg,* however, did not reach the question whether due process requires similar procedural safeguards in advance of *reductions* of benefits. Daniel v. Goliday, 398 U.S. 73, 90 S.Ct. 1722, 26 L.Ed.2d 57 (1970); Almenares v. Wyman, 453 F.2d 1075, 1082–1083 (2d Cir. 1971), cert. denied, 405 U.S. 944, 92 S. Ct. 962, 30 L.Ed.2d 815 (1972).

■ There is little room for doubt, however, that procedural due process is applicable to the reduction of welfare benefits. The level of benefits is a matter of statutory entitlement for those eligible to receive them and their reduction, like their termination, ". . . involves state action that adjudicates important rights." *Goldberg, supra,* 397 U.S. at 262.

Nevertheless, "[t]he extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss', [citation omitted] and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." *Id.* at 262–263.

Particularly in cases involving those most dependent on public assistance for their survival, even a modest reduction in benefits may cause the recipient "grievous loss." In many cases, even a reduction of a few dollars may have a devastating effect, especially when recipients make purchases or sign leases expecting that their benefits will continue at the same level. Indeed, Congress recognized the importance of this reliance interest when it required that states receiving medicaid appropriations provide supplemental payments adequate to bring recipients' S.S.I. benefits and other income up to their December, 1973 income level. (See p. 253, *supra.*)

On the other hand, the Government's interest in summary adjudications would appear to be less in cases in which recipients may be receiving over-payments than it would be where, as in Goldberg v. Kelly, ineligible persons may be receiving substantial payments during the time it takes to complete "fair hearing" procedures.

In this connection, it should be noted that the new legislation establishing the federal program contains no hint that prior hearings should not be required in such cases. Since H.E.W. regulations had required "fair hearings" in advance of reductions, 45 CFR § 205.10, it might be expected that if Congress considered such procedural safeguards to be unduly expensive, it would have said so.

■ The balance struck between the interests of the recipients in a fair hearing in advance of a loss of benefits and the interests of the Government in summary adjudication is, therefore, roughly the same in cases involving terminations and reductions. It necessarily follows that the same procedural guarantees must apply in reduction and termination cases.

■ Where recipients challenge proposed reductions "as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases," *Goldberg, supra,* 397 U.S. at 268, the procedural guarantees described in *Goldberg* must be applied.

17. Defendant has acknowledged on oral argument that terminations would require a prior opportunity to be heard. The court has, therefore, concluded that injunctive relief is not required as to terminations.

■ With respect to reductions based on purported increases in Social Security, or other federal benefits, due process similarly requires an opportunity to be heard before reductions become effective. These reductions may rest on "incorrect or misleading factual premises," *Goldberg, supra,* 397 U.S. at 268, such as an incorrect determination that the S.S.I. recipient was also receiving Social Security benefits.

However, it is obvious that, in such cases, a full evidentiary hearing will rarely be required since the court assumes *Goldberg* mandates only an opportunity to present evidence relevant to a material issue. In most cases involving reductions based on increases in other federal benefits, an informal conference will be sufficient since most disputes could be resolved by an examination of official records.

■ Nevertheless, since procedural due process applies to any reduction in benefits to a particular individual, notice and an opportunity to be heard must be afforded in any case presenting factual issues where the individual's interest in a prior hearing outweighs the Government's interest in summary adjudication. The nature of the hearing will depend on the kind of factual issues presented.

Defendant will be required not only to afford a hearing prior to any reductions, but also to afford ". . . adequate notice detailing the reasons for a proposed . . . [reduction] . . . ." *Goldberg, supra,* 397 U.S. at 267–268. In this connection, the court finds, at least for purposes of the preliminary injunction motion, that the Notice of Change in Social Security Benefit Cases (attached to Defendant's Answers to Written Interrogatories) provides reasonable notice of the basis for the proposed reduction but that the Notice of Change in Composite Household Cases fails to detail the reasons for the proposed change in an intelligible fashion.

■ Finally, the court concludes that reductions in advance of an opportunity to be heard are in violation of the Social Security Act. The statute provides:

"The Secretary shall provide reasonable notice and opportunity for a hearing to any individual who is or claims to be an eligible individual . . . and is in disagreement with . . . respect to eligibility of such individual for benefits, or the amount of such individual's benefits, if such individual requests a hearing on the matter in disagreement within thirty days after notice of such determination is received." 42 U.S.C. § 1383.

The court must assume that Congress, in providing for "reasonable notice and opportunity for a hearing" intended to require that recipients be afforded that opportunity to be heard mandated by due process.[18]

## 2. *Irreparable Harm*

■ It is clear that members of the class will suffer irreparable harm unless injunctive relief is granted. Even if the Secretary affords recipients an opportunity to be heard after reductions became effective, and, thereafter granted recipients retroactive payments after it was determined that the reductions were incorrect, such retroactive payments could not adequately compensate claimants.

As the Court held in *Goldberg, supra,* the eligible welfare recipient may be deprived of ". . . the very means by which to live while he waits. Since he lacks independent resources, his situa-

18. Defendant handed up to the court two manuals, attached to the affidavit of Stephen Casella, dated March 29, 1974, describing procedures for approving emergency payments to S.S.I. beneficiaries under certain circumstances. The court cannot find these emergency payments to be an adequate substitute for an opportunity to be heard in advance of reductions or terminations since it does not appear that these emergency payments are issued automatically to any recipient whose regular payment is reduced or terminated on the basis of an adverse factual determination and continued pending the granting of an opportunity to be heard to the recipient.

tion becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy." 397 U. S. at 264.

Indeed, due process requires a prior hearing because recipients would otherwise be irreparably harmed.

## CLASS ACTION

■ Plaintiff moves to bring this action on behalf of all other recipients of Supplemental Security Income benefits in New York State. The number of persons in the class is in the thousands.

The court holds that a class action is maintainable since plaintiff satisfies the requirements of both Rules 23(a) and 23(b)(2).

a). *The class is so numerous that joinder of all members is impracticable.* R. 23(a)(1).

b). *There are questions of law or fact common to the class.* R. 23(a)(2).

Although various recipients' S.S.I. benefits have been reduced for different reasons [19] the basic legal question in this lawsuit, applicable to all members of the class, is whether benefits can be reduced without a prior opportunity to be heard.

c). *The claims of the representative parties are typical of the class.* R. 23(a)(3).

It appears that Mr. Lyons' claim has been mooted. However, the claims of the fourteen intervenors are typical of the class.

d). *The representative parties will fairly and adequately protect the interests of the class.* R. 23(a)(4).

Since it does not appear that the interests of the intervenors are antagonistic to those of the rest of the class, one of the most important factors in deciding the adequacy of the representation is whether the party's counsel is generally able to conduct the proposed litigation. The court has observed and the record will reflect the skill of plaintiff's counsel in the proceedings already completed in this action.

e). *The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.* R. 23(b)(2).

Defendant has reduced assistance payments in several thousand cases on grounds applicable to the entire class, that is, that prior hearings involving reductions are not required by the Constitution, regulation, or statute when based on a determination that recipients were receiving excessive payments prior to the federal take-over of the program or had obtained additions in their Social Security payments.

It is clear that final injunctive relief might be appropriate for the class as a whole.

## SUMMARY

The court finds that it has jurisdiction of this action. It is undisputed that several thousand S.S.I. recipients in New York State have had their S.S.I. benefits reduced as of March 1, 1974 without prior notice or opportunity to be heard based on information furnished by New York. Plaintiff is entitled to preliminary injunctive relief since he has satisfied his burden of showing a probability of success on the merits and that irreparable harm will result if such relief is denied. Moreover, even if that standard had not been met, plaintiff would be entitled to injunctive relief since he has raised serious questions and the balance of hardships tips sharply in plaintiff's favor.

The court has also determined that plaintiff may bring this action on behalf of all recipients of Supplemental Security Income benefits in New York.

Defendant will be preliminarily enjoined, pending the trial of the perma-

---

19. Reductions have been based on the grounds set forth at p. 261 *supra* and the Social Se-

curity increases which became effective on April 1, 1974.

nent injunction, from reducing S.S.I. benefits of any recipient residing in New York in advance of adequate notice of the grounds of the reduction and an opportunity to be heard, provided that the reduction is based on factual determinations as to particular cases.

Trial of plaintiff's motion for a permanent injunction will commence on August 15, 1974 at 10:00 A.M.